[Cite as *State v. Kincaid*, 2024-Ohio-2668.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,         : CASE NO. 22CA4

    v.                          :

JOHN P. KINCAID,                        : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.        :

_____

APPEARANCES:

Donald K. Pond, Akron, Ohio, for appellant[1].

James K. Stanley, Meigs County Prosecuting Attorney, Pomeroy, Ohio, for appellee.

_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:7-5-24
ABELE, J.

{¶1}  This is an appeal from a Meigs County Common Pleas Court judgment of conviction and sentence.  John Kincaid, defendant below and appellant herein, assigns two errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION TO SUPPRESS, CONTRARY TO APPELLANT'S RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES, PURSUANT TO THE FOURTH AND FOURTEENTH AMENDMENTS TO THE

_____
[1]  Different counsel represented appellant during the trial court proceedings.

UNITED STATES CONSTITUTION, AND ARTICLE I,
SECTION 14 OF THE OHIO CONSTITUTION."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED BY OVERRULING
APPELLANT'S MOTION TO SUPPRESS, CONTRARY TO
APPELLANT'S RIGHT AGAINST SELF-
INCRIMINATION, PURSUANT TO THE FIFTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, AND ARTICLE I, SECTION 10 OF
THE OHIO CONSTITUTION."

{¶2} In January 2021, a Meigs County Grand Jury returned an indictment that charged appellant with (1) one count of possession of drugs (heroin) in violation of R.C. 2925.11(A), (2) one count of possession of drugs (fentanyl) in violation of R.C. 2925.11(A), (3) one count of trafficking in drugs (heroin) in violation of R.C. 2925.03(A)(2), and (4) one count of trafficking in drugs (fentanyl) in violation of R.C. 2925.03(A)(2), all second degree felonies. Appellant pleaded not guilty to all charges.

{¶3} Subsequently, appellant filed a motion to suppress evidence. At the suppression hearing, Meigs County Sheriff's Deputy Tylun Campbell, a canine handler, testified that during the nighttime hours of December 26, 2019 he observed a vehicle's left side tires cross a two-lane road center line. Campbell checked the license plate and learned that the vehicle belonged to appellant. Campbell also stated that he had received "prior information that he [appellant] was trafficking in drugs * * *

in our county."  When Campbell initiated the traffic stop, he recognized appellant because he had "seen him around," but did not personally know him.  When Campbell informed appellant of the reason for the stop, appellant stated he had been "blinded by my [Campbell's] lights."

{¶4}  At that point, Deputy Campbell requested another officer come to the scene to be present when Campbell deployed his canine.  Campbell waited "less than ten (10), five minutes. Something like that" for Deputy Marty Hutton to arrive. Campbell also spoke to appellant and to passenger Austin Johnson and asked if they had "anything illegal * * * inside the vehicle."  Both stated no.  Campbell then checked their licenses, found no warrants, and after Hutton arrived, appellant and Johnson remained in the vehicle while Campbell deployed his canine.  The canine alerted to the driver's side door.

{¶5}  After the positive canine alert, Deputy Campbell removed appellant and Johnson from the vehicle, patted them down, then placed appellant in front of Campbell's cruiser and Johnson in Deputy Hutton's cruiser.  When Campbell asked appellant if anything in the vehicle could harm him, appellant said he "may have dropped a bag of heroin."  Campbell testified that the vehicle search revealed a cigarette box under the driver's seat with "a bunch of bags of, uh, I believed to be heroin."  Campbell observed that the cigarette box contained

"multiple individual knotted bags of heroin and fentanyl, I believe." Campbell also found money "under the floorboard." Appellant told Campbell the money came "from the * * * drugs that he was selling." At that point, Campbell advised appellant of his Miranda rights and placed him in handcuffs. Appellant later told Campbell, "he was selling the drugs for another individual, uh, named, uh, chops, I believe. Uh, his real name is Dryshaun Bear."

{¶6} On cross-examination, Deputy Campbell conceded that he did not issue a citation for the traffic violation. When asked if he performed any further investigation regarding the marked lanes violation, Campbell stated, "No." When asked, "[y]our investigation essentially, of that issue, was over at the time that you pulled him over and made him aware as to why you stopped him, correct," Campbell stated, "[u]h, yes." Campbell testified, "When I made the decision to run the dog is when I observed John Kincaid as the driver of the vehicle."

{¶7} The trial court eventually overruled appellant's motion to suppress evidence and appellant pleaded no contest to Count Three, trafficking in drugs in violation of R.C. 2925.03(A)(2), a second-degree felony, and Count Four, trafficking in drugs in violation of R.C. 2925.03(A)(2), a second-degree felony. The court accepted appellant's pleas, found appellant guilty and: (1) imposed a three-year minimum up

to four and one-half years indeterminate prison sentence for Count Three; (2) merged counts three and four for purposes of sentencing, (3) forfeited the $1,570 seized, and (4) ordered a mandatory post-release control term.  This appeal followed.

## I.

{¶8}  In his first assignment of error, appellant asserts that the trial court's decision to overrule his motion to suppress evidence violates his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 14 of the Ohio Constitution.  In particular, appellant argues that (1) the totality of circumstances of the traffic stop did not justify appellant's detention for a vehicle canine sniff, and (2) the police officer did not develop rational inferences, based on specific, articulable facts, to justify the extended investigatory detention of, and intrusion upon, appellant following the traffic stop.

{¶9}  Generally, appellate review of a motion to suppress evidence presents a mixed question of law and fact.  *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 16, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8l, *State v. Hansard,* 4th Dist. Gallia No. 19CA11, 2020-Ohio-5528, ¶ 15.  When ruling on a motion to suppress evidence, a trial court assumes the role of trier of

fact and is in the best position to resolve questions of fact and evaluate witness credibility. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Thus, a reviewing court must defer to a trial court's findings of fact if competent, credible evidence exists to support the trial court's findings. *Id.; State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982); *State v. Debrossard*, 4th Dist. Ross No. 13CA3395, 2015-Ohio-1054, ¶ 9. A reviewing court must then independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the case's facts. *See Roberts* at ¶ 100; *Burnside*, *supra*, at ¶ 8.

{¶10} The Fourth Amendment to the United States Constitution and Article I, Section Fourteen of the Ohio Constitution protect individuals from unreasonable searches and seizures. *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15; *State v. Shrewsbury,* 4th Dist. Ross No. 13CA3402, 2014-Ohio-716, ¶ 14. The exclusionary rule protects this constitutional guarantee and mandates excluding evidence obtained from an unreasonable search and seizure. *Id.*

{¶11} The case sub judice involves a vehicle traffic stop after an officer observed a traffic law violation. The Supreme Court of Ohio has also held "[w]here a police officer stops a vehicle based on probable cause that a traffic violation has

occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop [.]" *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996), paragraph one of the syllabus. *See, also, Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Debrossard, supra,* at ¶ 13; *State v. Guseman*, 4th Dist. Athens No. 08CA15, 2009-Ohio-952, ¶ 20.

{¶12} In the case sub judice, appellant argues that after the initial stop, the officer did not provide sufficient justification to extend the length of the stop in order to conduct the canine sniff. Appellant points out that no additional facts in the record support reasonable suspicion to extend the stop, the officer did not see or smell drugs or observe other contraband in the vehicle, and no indication existed that appellant or his passenger appeared to be impaired. Appellant claims that the only facts offered in support of the prolonged detention is the traffic violation itself and Deputy Campbell's prior knowledge of appellant's alleged drug trafficking history.

{¶13} We recognize that "knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion" to justify a shift in an investigatory intrusion from the

traffic stop to a firearms or drugs investigation. *State v. Whitman*, 184 Ohio App.3d. 733, 2009-Ohio-5647, 922 N.E.2d 293 (5th Dist.2009), citing *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994). As the court explained in *Sandoval*:

> If the law were otherwise, any person with any sort of criminal record - or even worse, a person with arrests but no convictions - could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a reasonable suspicion, and of the need that such stops by justified in light of a balancing of the competing interests at stake. *Id.* at 543. *Accord Joshua v. DeWitt* (C.A.6, 2003) 341 F.3d 430, 446.

Thus, a "person's reputation or past record does not, standing alone, provide an officer with a reasonable suspicion to support a *Terry*-type investigative stop or search." *Whitman* at ¶ 16, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶14} Additionally, we recognize that courts have concluded that the use of a drug detection canine does not constitute a "search" and an officer is not required, prior to a canine sniff, to establish either probable cause or a reasonable suspicion that drugs are concealed in the vehicle. *See Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Consequently, an officer needs no suspicion or cause to run a dog around a stopped vehicle if performed contemporaneously with legitimate activities associated with the

traffic violation. *Id.* Thus, a canine walk-around of a vehicle that occurs during a lawful traffic stop and does not extend the time necessary to effectuate the stop, does not violate an individual's constitutional rights. *Id.* However, absent a reasonable suspicion of criminal conduct an officer may not extend an otherwise-completed traffic stop to conduct a canine sniff. *Rodriguez v. United States,* 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015)*.*

{¶15} In general, an investigative stop may last no longer than necessary to accomplish the initial goal of the stop:

> Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, *Caballes*, 543 U.S., at 407, 125 S.Ct. 834 and attend to related safety concerns, infra, at 1619 – 1620. *See also United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Ibid. See also Caballes*, 543 U.S., at 407, 125 S.Ct. 834. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. *See Sharpe*, 470 U.S., at 686, 105 S.Ct. 1568 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

*Rodriguez,* 575 U.S. 348 at 354, 135 S.Ct. 1609. Therefore, the pertinent question is not whether a canine sniff occurs before or after an officer issues, or could have issued, a traffic

citation, but whether the canine sniff extends the stop. *Id.*

{¶16} Law enforcement tasks generally associated with traffic infractions include: (1) determining whether to issue a traffic citation, (2) checking the driver's license, (3) determining the existence of outstanding warrants, (4) inspecting the vehicle's registration, and (5) examining proof of insurance. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *State v. Farrow*, 2023-Ohio-682, 209 N.E.3d 830, ¶ 14 (4th Dist.), citing *Rodriguez* at 355, 135 S.Ct. 1609; *State v. Aguirre*, 4th Dist. Gallia No. 03CA5, 2003-Ohio-4909, ¶ 36 (during a traffic stop, motorist may be detained for a period of time sufficient to issue a citation "and to perform routine procedures such as a computer check on the motorist's driver's license, registration, and vehicle plates").

{¶17} After a reasonable time for the purpose of the original traffic stop to elapse, an officer must then have "'a reasonable articulable suspicion of illegal activity to continue the detention.'" *State v. Jones,* 2022-Ohio-561, 185 N.E.3d 131, ¶ 22 (4th Dist.), quoting *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13 (2d Dist.).

> When a police officer's objective justification to
> continue detention of a person stopped for a traffic
> violation for the purpose of searching the person's

> vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continuing detention to conduct a search constitutes an illegal seizure.

*State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762 (1997), paragraph one of the syllabus.

{¶18} Thus, if after talking with a driver a reasonable police officer would be satisfied that no unlawful activity had occurred, the driver must be permitted to continue on his way. *State v. Venham*, 96 Ohio App.3d 649, 656, 645 N.E.2d 831, 835 (4th Dist.1994). If, however, the officer "ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." *Robinette* at 241, 685 N.E.2d 762. The detention of the motorist may last as long as the reasonable suspicion of criminal activity continues. "However, the lawfulness of the initial stop will not support a 'fishing expedition' for evidence of another crime." *Venham*, 96 Ohio App.3d 649, 655, 645 N.E.2d 831, 834 (4th Dist.1994).

{¶19} Consequently, "[t]he detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the

intial stop." *Batchilli* at ¶ 15, citing *State v. Myers*, 63 Ohio App.3d 765, 771, 580 N.E.2d 61 (2d Dist.1990); *Venham*, 96 Ohio App.3d 649, 655, 645 N.E.2d 831, *State v. Howard*, 12th Dist. Preble No. CA 2006-02-002, CA 2006-02-003, 2006-Ohio-5656, ¶ 16. The "reasonable and articulable" standard applied to a prolonged traffic stop encompasses the totality of the circumstances." *Id.* at ¶ 16, citing *United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). However, *Rodriguez v. United States*, *supra*, prohibits seizures that result from inquiries unrelated to the purpose of a traffic stop that "measurably extend[s] the duration of the stop." *Id.* at 1615.

**{¶20}** Ohio courts do not apply a bright-line test as to a specific amount of elapsed time to determine whether a traffic stop has been unreasonably prolonged. The Supreme Court of Ohio has held, "[a] traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and *not yet completed* at the time a drug dog alerts on the vehicle." *State v. Batchilli,* 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.S.2d 1282, ¶ 14 (Emphasis added). Instead, courts look at the totality of the circumstances to determine if an unreasonable prolonged delay occurred. The Second District Court of Appeals observed:

> In the wake of *Rodriguez*, Ohio courts have continued to apply a duration-based standard for evaluating traffic stops such as the stop at issue in this case. *See, e.g.,*

> *State v. Matheney*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, 2016 WL 6672805, ¶ 21-32; *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, 2016 WL 1288000, ¶ 15-23; *State v. Reece*, 1st Dist. Hamilton No. C-140635, 2015-Ohio-3638, 2015 WL 5257151, ¶ 15-25; but see *State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, 2016 WL 2944821, ¶ 10-14 (describing *Rodriguez* as "arguably prohibit[ing] [a] seizure[ ] resulting from inquiries unrelated to the initial purpose of a traffic stop" if the unrelated inquiries measurably extend the stop's duration). These cases establish that to determine whether a police officer completes a traffic stop within a reasonable length of time, a court should evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently pursued the corresponding investigation. (Citations omitted.) *Matheney*, 2016-Ohio-7690, 2016 WL 6672805, ¶ 22.

*State v. Mee,* 2017-Ohio-7343, 96 N.E.3d 1020, ¶ 19 (2d Dist.).

**{¶21}** Some Ohio courts have found constitutional violations that involved a relatively short stop duration. *See State v. Byrd,* 2022-Ohio-4635, 204 N.E.3d 681 (8th Dist.)(although canine sniff within 15 minutes of traffic stop, officer acknowledged investigation concluded eight minutes before canine's arrival), *State v. Thomas,* 2020-Ohio-3539, 154 N.E.3d 1074 (9th Dist.) (traffic stop not completed within reasonable period of time given officer normally takes 10-15 minutes to write warning, but evidence showed "a pause of more than three minutes during the stop, prior to the arrival of the K-9 unit, where the officer was not diligently conducting the investigation."), *State v. Neyhard*, 11th Dist. Ashtabula No. 2021-A-0005, 2022-Ohio-1098 (10 minutes unreasonable when video and testimony did not

"affirmatively demonstrate that the officer was awaiting any information from dispatch necessary to finishing the tasks reasonably related to the purpose of the stop."); *State v. Green,* 2016-Ohio-4810, 69 N.E.3d 59 (7th Dist.)(similar to *Rodriguez*, officer made the stop, then called for canine officer, wrote and issued the warning in one to two minutes, canine took 10 minutes to arrive and another three to search the vehicle; dog did not complete the vehicle sniff until 11-12 minutes after warning issued, this improperly extended time beyond time required for traffic stop).

{¶22} However, other Ohio courts have concluded that a very brief stop, similar to the duration of the stop in the present case, does not violate the Fourth Amendment. *See State v. Johnson,* 2d Dist. Montgomery No. 20624, 2005-Ohio-1367 (no violation when officer testified typical stop requires 15-20 minutes to complete and sniff occurred 7 minutes into stop), *State v. Blatchford*, 2016-Ohio-8456, 79 N.E.3d 97 (12th Dist.)(no violation when officer testified normal traffic stop between 15-20 minutes, dog arrived within ten minutes and alerted within 12.5 minutes), *State v. Cook*, 65 Ohio St.3d 516, 521-522, 605 N.E.2d 70 (1992) (15 minute detention reasonable). *See also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (20 minute detention reasonable); *Illinois v. Caballes*, 543 U.S. 405, 410, 125 S.Ct. 834, 160 L.Ed.2d 842

(2005) (no constitutional violation when canine sniff less than 10 minutes after initiation of stop, defendant placed in cruiser and officer not yet issued a citation); *Batchilli*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, at ¶ 14 (no evidence to suggest detention for traffic violation of sufficient length to make it constitutionally dubious when dog alerted eight minutes and 56 seconds into the stop and neither background check nor traffic citation had been completed); *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E.2d 1138, ¶ 23 (6th Dist.)(no violation when canine sniff occurred within 15 minutes of stop, a reasonable time to process a traffic citation).

{¶23} While many of the cited cases are pre-*Rodriguez, in State v. Gurley,* 2015-Ohio-5361, 54 N.E.3d 768 (4th Dist.), we considered a post-*Rodriguez* case when the officer observed the defendant following another vehicle too closely, a canine alerted 5 minutes into the stop, the officer testified it typically takes 10-12 minutes to issue a citation during a routine traffic stop, the officer recalled a previous stop of the defendant, and the officer's investigation revealed the defendant had limited driving privileges.  There, the officer testified that a normal stop takes 10 to 12 minutes and the dog sniff did not prolong the stop.

{¶24} Similarly, In *State v. Miles*, 5th Dist. Licking No. 2020 CA 00052, 2021-Ohio-1029, three minutes after law

enforcement conducted a traffic stop, an officer requested a canine handler, who arrived in two minutes. Three minutes after the canine arrived, the dog alerted on the car. When the defendant appealed the denial of his motion to suppress evidence, the court held:

> In the case at bar, the stop occurred at approximately 9:38 p.m. At approximately 9:41 p.m., Officer Carter requested a canine handler report to his location. The officer and the drug-sniffing dog arrived at approximately 9:43 p.m. At approximately 9:46 p.m., the doc alerted on the car. Thus, eight minutes elapsed from the time the car was stopped until the canine alerted to possible drugs in the car. Officer Carter testified that it normally takes him ten to fifteen minutes to write a traffic citation. There is no evidence in the record that Officer Carter could have completed writing the traffic citations before 9:43 p.m. Nor is there evidence that Officer Carter could have completed issuing the traffic citations before 9:46 p.m., the time that the canine alerted on the car. Once the drug dog alerted to the vehicle, the police had probable cause to search that vehicle for contraband.
>
> Accordingly, in the case at bar the canine sniff did not add time to the time necessary to complete issuing traffic citations for driving under suspension and a turn signal violation. In other words, the dog sniff did not add time to the traffic stop. *Rodriguez v. United States*, 575 U.S. at 357, 135 S.Ct. 1609, 191 L.Ed.2d 492.

*Miles* at ¶ 14-15.

**{¶25}** In the case sub judice, Deputy Campbell testified that, after he checked appellant's license plate before the late-night stop, he knew when he approached the vehicle that the driver, appellant, had been "trafficking drugs in our * * *

county." Campbell testified that[2], although he intended to

_____

[2] The following testimony is particularly relevant to our analysis.

Page 14 of the transcript provides:
Q: Ok. And, if you would, tell me... tell me why you had to wait for somebody else to get there after you made the decision you were going to run your canine around the vehicle?
A: Um, mainly just for officer safety. I mean, it was dark, there was two of them, um, it's better to have eyes on, you know, I'm paying attention to my dog running around the vehicle and having, you know, people inside the vehicle that I can't pay attention to is...
Q: Ok. And, so do you recall about how long it was when Deputy Hutton got there?
A: Uh, it was less than ten (10), five minutes. Something like that.
Q: Ok. And, that would be on the logs you have...
A: Right.

Page 17 of the transcript states:
Q: What was the purpose?
A: Um, so we could search the vehicle.
Q: Ok. So, based on the hit from the dog, you decided to search the vehicle?
A: Yes.
Q: Ok. And, so what happened when you got to the vehicle and basically told them what you were
wanting them to do?
A: Um, Austin Johnson got out of the vehicle, I believe, Deputy Hutton may have patted him down and then, no, I patted ... I patted Austin Johnson down and returned back to the vehicle. We asked John Kincaid to exit the vehicle, uh, he ... at first, he refused to exit the vehicle, he said no, I'm not getting out of the car, and then I opened the driver's door and he said ok, ok, I'm getting out, I'm getting out, don't hurt me.
Q: Ok.
A: So, then he was then patted down and searched at that time.
Q: Ok. And, where ... where was Mr. Kincaid and Mr. Johnson placed, if you know, while were you were going to begin your search of the vehicle?
A: Uh, John Kincaid was placed at the front of my vehicle.

Page 29 of the transcript states:
Q: Yea. And at that point informed him of the marked lanes

violation. Correct?
A: Correct.
Q: And, then immediately thereafter you made the decision to run your dog. Is that correct?
A: Yes.
Q: And, when I say immediately thereafter, are we just talking a few seconds after?
A: I'd say a few minutes, yea.
Q: Ok. And, so, fill me in on what occurred during those few minutes.
A: Um, I, like I stated earlier, I marked Deputy Hutton to come to my location and then after he arrived there, I deployed my canine.
Q: And, you would agree with me that when you ... when you called for Deputy Hutton, at that time, you had made the decision that you wanted ... you were going to run the dog. Correct?
A: Uh, yes.
Q: I mean, that was the point in bringing backup to ... to a traffic stop.
A: Sure.
Q: Correct?
A: Yea.

Finally, page 34 of the transcript states:
Q: I'm trying to figure out when you made the decision to run the dog.
A: When I made the decision to run the dog is when I observed John Kincaid as the driver of the vehicle.
Q: Ok.  And ... and what ... had you met with Mr. Kincaid before?
A: No, but I ... I did have prior information that he was trafficking drugs in our ... in our county.
Q: Ok. And, so you identified Mr. Kinkaid, um, did you ... did you identify Mr. Kincaid prior to pulling him over?
A: Um, no.  I ... I seen the vehicle when I was behind it and I observed the marked lanes violations and when I walked up to the vehicle, I ... I identified that it was John Kincaid driving the vehicle.

immediately deploy the canine that accompanied him in his vehicle, for safety reasons, due to the lateness of the hour and the fact that two individuals occupied the suspect's vehicle, he waited for Deputy Hutton to arrive to serve as back-up protection. Campbell then spoke with appellant and Johnson to ask if they had anything illegal in the vehicle, and he performed administrative tasks associated with the traffic stop, such as a check of the status of appellant's and Johnson's driver's licenses and to discover the existence of any outstanding warrants.

{¶26} We recognize that in the case at bar the officer did not offer sufficient information or justification to prolong the traffic stop beyond the time associated with normal duties generally associated with traffic stops. We also recognize that the officer did not provide detailed testimony concerning the normal general administrative duties associated with traffic stops, including the check of appellant's registration, the status of appellant's driver's license, the vehicle's insurance coverage or provide the exact time when Deputy Campbell concluded these administrative tasks while he waited for Deputy Hutton to arrive. The only reference to the stop's duration is Campbell's testimony that Hutton arrived less than ten minutes after he summoned him. Moreover, although Campbell agreed with trial counsel's question, "[y]our investigation essentially, of

that issue, was over at the time that you pulled him over and made him aware as to whey you stopped him, correct?," we observe that this testimony should not necessarily result in the conclusion that the duration of the stop terminated at the moment the stop began as appellee suggests. Instead, after this stop for a violation of traffic law that the officer initially determined that he did not wish to pursue, the officer performed general administrative tasks associated with the stop. Also, there is no requirement that an officer issue a citation for a minor misdemeanor traffic violation even if the offense had sufficient basis to make the stop. Admittedly, although a more detailed recitation of the officer's activities during that ten minute time period would have been advisable, after our review, and based upon the specific facts adduced in the case sub judice, we do not conclude that the canine sniff improperly or unreasonably prolonged this traffic stop. *Rodriguez,* 575 U.S. 348, 135 S.Ct. 1609, paragraph one of the syllabus. Here, the dog alerted to the presence of drugs less than ten minutes into the stop, similar to *Miles, supra,* when the dog alerted eight minutes into the stop. Once alerted to the presence of drugs, the officer then possessed probable cause to search appellant's vehicle. *Gurley* at ¶ 28.

**{¶27}** Once again, we recognize that Deputy Campbell did not initially possess specific and sufficient information about

appellant's alleged drug trafficking activity to extend the time and purpose of the stop beyond the reason for the initial stop. However, most importantly in this case, although Campbell immediately decided to deploy his canine, the only reason he did not immediately do so involved his personal safety.  Thus, the canine sniff occurred less than ten minutes into the stop after Hutton arrived to engage in back-up duties.  This is not unreasonable conduct in light of the fact that traffic stops, especially stops late at night and with multiple occupants in a vehicle, represent some of the most perilous encounters for law enforcement officers.  Consequently, officer safety should be of paramount importance and a legitimate consideration if such activity does not unreasonably extend the time required to conduct a traffic stop.  Here, our review of the facts reveal that arrival of the back-up officer did not unreasonably extend the traffic stop's duration.

{¶28} Thus, because we conclude the traffic stop's duration did not improperly and unreasonably extend the length of the stop, we overrule appellant's first assignment of error.


                                    II.

{¶29} In his second assignment of error, appellant asserts the trial court erred when it overruled appellant's motion to suppress evidence of incriminating statements, pursuant to the

Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.  In particular, appellant argues that, before Deputy Campbell issued the required *Miranda* warnings, he conducted a custodial interrogation of appellant at the scene of the traffic stop and elicited incriminating statements about drug activity.

**{¶30}** In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that statements made during custodial interrogation, i.e., "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," are admissible only upon a showing that law enforcement officials followed certain procedural safeguards to secure the accused's Fifth Amendment privilege against self-incrimination.'"  *State v. Phillips*, 4th Dist. Highland No. 11CA11, 2011-Ohio-6773, ¶ 9, quoting *Miranda*, at 444, 86 S.Ct. 1602.  Those safeguards include informing defendant of "the right to remain silent, that anything the defendant says can be used against him a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda* at 479, 86 S.Ct. 1602.

**{¶31}** The requirement that police officers administer *Miranda* warnings applies "only when a suspect is subjected to both custody and interrogation." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24. In the case at bar, we conclude that appellant had not been placed in custody when he made these statements.

> The Supreme Court of Ohio has held that an individual temporarily detained as part of a routine traffic or investigatory stop ordinarily is not "in custody" and is not, therefore, entitled to Miranda warnings. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 13; citing *Berkemer v. McCarty* at 439-440, 104 S.Ct. 3138 (noting that investigative stops are not subject to Miranda requirements and holding that Miranda not implicated during traffic stop for swerving when officer questioned driver about his drinking). Thus, "most traffic stops and accompanying investigatory questioning do not constitute custodial interrogations warranting the right to Miranda warnings." *State v. Brocker*, 11th Dist. Portage No. 2014-P-0070, 2015-Ohio-3412, 2015 WL 5005120, ¶ 17 (citations omitted); see *State v. Jackson*, 9th Dist. Summit Nos. 27132, 27200, 27133, 27158, 2015-Ohio-5246, 2015 WL 9048666 (determining that Miranda did not apply to traffic stop during which officer asked defendant where he had been and whether he had purchased any items at the store where he had been); *State v. Campbell*, 2nd Dist. Montgomery No. 26497, 2015-Ohio-3381, 2015 WL 4993574, (determining that Miranda not implicated during investigative stop to ascertain whether eighteen-year-old defendant had been drinking when there was no evidence that defendant was handcuffed, and the defendant was not informed that he was under arrest or detained in police car); *State v. Smoot*, 2015-Ohio-2717, 38 N.E.3d 1094, 1112-13, ¶ 41 (determining that defendant was not in custody for purposes of Miranda when officer asked defendant about the contents of his vehicle during traffic stop); *State v. Vineyard*, 2nd Dist. Montgomery No. 25854, 2014-Ohio-3846, 2014 WL 4384153 (determining that defendant not in custody during traffic stop even though officer asked defendant to exit his vehicle and asked defendant

whether he had any weapons); *State v. Ware*, 8th Dist. Cuyahoga No. 89945, 2008-Ohio-2038, 2008 WL 1903993 (concluding that Miranda was not applicable during a routine traffic stop in which officer asked defendant if he had any weapons, drugs, or contraband in the vehicle); *State v. Leonard*, 1st Dist. Hamilton No. C-060595, 2007-Ohio-3312, 2007 WL 1874232 (holding that Miranda warnings were not required when an officer removed defendant from his vehicle and placed defendant in front passenger seat of officer's patrol vehicle for questioning). However, during a traffic or investigative stop circumstances may change and render an individual "in custody" for practical purposes and, thus, " 'entitled to the full panoply of protections prescribed by Miranda.' " *Farris* at ¶ 13; quoting *Berkemer* at 440, 104 S.Ct. 3138.

*State v. Casteel*, 2017-Ohio-8303, 98 N.E.3d 889, ¶ 17 (4th Dist.).

**{¶32}** The Supreme Court of Ohio held that the relevant inquiry is "whether a reasonable person in the suspect's position would have understood himself or herself to be *in custody*." *Cleveland v. Oles,* 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 30. Ultimately the court concluded that, based on the totality of the circumstances, the suspect was not in custody and no constitutional violation occurred when the officer stopped the suspect, asked him to sit in the patrol car, questioned him regarding his destination and how much alcohol he had consumed, directed him to perform field sobriety tests, and arrested him, all without giving *Miranda* warnings. *Id.* at ¶ 2-4, 33. The court added that "[f]or purposes of the constitutional privilege against self-incrimination, the test is

not whether the individual feels free to leave but whether the situation 'exerts upon a detained person pressure that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.' "  *Id.* at ¶ 31, citing *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed. 2d 317 (1984).

**{¶33}** In the case sub judice, after our review we believe that appellant's statements, made during the traffic stop and prior to the search, did not rise to the level of custodial interrogation that requires *Miranda* warnings.  When Deputy Campbell asked appellant if he "was sure there was no illegal drugs inside the vehicle, and he said he may have dropped a bag of heroin," this exchange did not occur during a custodial interrogation because appellant had not been placed in custody. Thus, the trial court did not err by denying appellant's motion to suppress evidence.

**{¶34}** Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

Hess, J.: Dissenting Opinion

{¶35} I respectfully dissent. The trial court erred in overruling Kincaid's motion to suppress the evidence from the traffic stop because the officer extended the traffic stop without sufficient justification. The officer testified that he stopped Kincaid for a marked lane violation. The officer ran the license plate on the vehicle prior to stopping the vehicle and knew prior to stopping Kincaid that the vehicle belonged to him. Upon approaching the vehicle, the officer explained the reason for the stop and inquired whether Kincaid and his passenger had any illegal drugs inside the vehicle. Kincaid apologized for the marked lane violation and both he and his passenger answered, "No" when asked about the presence of illegal drugs. The officer decided not to issue a citation for the marked lane violation. At that point, Kincaid should have been permitted to leave because the reason for the stop had been addressed and there was no further justification to detain Kincaid. The officer testified that his investigation of the marked lane violation was over at the time that he informed Kincaid of the marked lane violation.  However, the officer testified that he decided to perform a canine sniff of the vehicle based on his understanding of Kincaid's reputation as a drug trafficker. He called a second officer to the scene so that the canine sniff could be conducted

safely. The officer waited approximately 5 to 10 minutes for the second officer to arrive and then conducted the canine sniff.

{¶36} The officer's only justification for prolonging the stop was Kincaid's reputation as an alleged drug trafficker. However, as the majority astutely recognizes, "knowledge of a person's prior criminal involvement . . . is alone insufficient to give rise to the requisite reasonable suspicion." *State v. Whitman*, 2009-Ohio-5647, ¶ 15 (5th Dist.); *State v. Stevens*, 2016-Ohio-5017, ¶ 36 (4th Dist.) (Harsha, J., concurring) ("It is important to note that a person's past criminal history, standing alone, does not provide the required level of suspicion to justify expanding the scope of the initial intrusion from a traffic stop into a criminal investigation."). Kincaid should have been free to leave after he was informed of the marked lane violation. *Florida v. Royer*, 460 U.S. 491, 500 (1983) (the scope and duration of a routine traffic stop must be carefully tailored to its underlying justification and last no longer than is necessary to effectuate the purpose of the stop). However, the officer decided to investigate matters not reasonably within the scope of his suspicion and look for evidence of another crime. He detained Kincaid for 5 to 10 more minutes to conduct a canine sniff even though there was no justification to do so. After the reasonable time for issuing a citation has elapsed, an officer must have a reasonable articulable suspicion of illegal activity to continue the detention. *State v. Jones*,

2022-Ohio-561, ¶ 22 (4th Dist.). The officer gave no facts to support a reasonable suspicion that would justify extending the traffic stop. The continued detention of Kincaid to conduct the canine sniff constituted an illegal seizure and violated his right against unreasonable searches and seizures as guaranteed by the Fourth Amendment.

JUDGMENTY ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J.: Dissents with Dissenting Opinion
Wilkin, J.: Concurs in Judgment & Opinion

For the Court

_____
Peter B. Abele, Judge

NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.